IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IVETTE PAYNE, | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | NO.   21-cv-5635 |
| | : | |
| KILOLO KIJAKAZI, | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                    June 20, 2023

Plaintiff Ivette Payne brought this action seeking review of the Acting Commissioner of Social Security Administration's decision denying her claim for Social Security Disability Insurance ("SSDI") benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This matter is before me for disposition upon consent of the parties. For the reasons set forth below, Plaintiff's Request for Review (ECF No. 7) is **DENIED.**

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed an SSDI application on June 8, 2020, alleging disability since January 14, 2020 due to fibromyalgia, degenerative disc disease ("DDD"), and pelvic floor dysfunction. (R. 173-79). The application was denied at the initial level and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 65-88, 100-01). Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified at a hearing conducted telephonically on April 15, 2021. (R. 31-64). On April 30, 2021, the ALJ issued a decision that was unfavorable to Plaintiff. (R. 12-30). Plaintiff appealed, and the Appeals Council denied her request for review on October 25, 2021, making the ALJ's

decision the final decision of the Acting Commissioner for purposes of judicial review.  (R. 1-6).

On December 28, 2021, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On January 24, 2022, she consented to my jurisdiction.  (Magistrate Consent, ECF No. 5).  Plaintiff's Brief and Statement of Issues in Support of Request for Review was filed on April 28, 2022 (Pl.'s Br., ECF No. 7), and the Acting Commissioner filed her response on June 15, 2022 (Def.'s Br., ECF No. 10).  On June 29, 2022, Plaintiff filed a reply brief.  (Pl.'s Reply Br., ECF No. 11).

## II.      FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was fifty-eight years old on her alleged disability onset date.  (R. 192).  She completed two years of college and has past experience working as an event/meeting planner. (R. 196).

### A.      Medical Evidence

Medical records from 2019 show that rheumatologist, Barry Getzoff, D.O., treated Plaintiff's fibromyalgia before her alleged January 14, 2020 onset date.  (R. 407-410, 416-18, 425-30).  Dr. Getzoff noted Plaintiff had arthralgia of the pelvic region, inflammatory polyarthropathy, degeneration of the cervical intervertebral disc, and age-related osteoporosis. (R. 407, 416, 425, 428).  Plaintiff's examination findings were generally unremarkable. although she did report difficulties with ambulation because of perineal pain and a great deal of pelvic pain when driving to work.  (R. 407-08, 416-17, 425-26, 428-29).  Dr. Getzoff prescribed Lyrica and Zanaflex, and he noted that Lyrica was helpful.  (*Id.*).

Plaintiff was also examined in 2019 by Tayyaba Ahmed, D.O., a pelvic rehabilitation specialist in New York City, and by Steven Mazlin, M.D., a neurologist.  (R. 251-55, 461-63, 498-500).  The neurologist did not note any abnormalities on examination, except for Plaintiff reporting knee pain when she hopped on either foot, especially the left foot.  (R. 251, 253-54).  The pelvic rehabilitation specialist's physical examination showed decreased range of motion of the bilateral hips, pain with extension and rotation of the hips, sacroiliac joint tenderness bilaterally, and positive tenderness and allodynia upon pelvic examination.  (R. 462, 499).  Plaintiff complained about pelvic pain, which worsened at night but did not keep her from sleeping.  (R. 462, 498).  Dr. Ahmed assessed pelvic and perineal pain, unspecified myalgia, chronic pain syndrome, unspecified regional pain syndrome, and fibromyalgia.  (R. 463, 499).  Plaintiff was prescribed a course of physical therapy for her pelvic floor and yoga.  (R. 463, 499-50).

In 2019, MRIs were taken of Plaintiff's cervical spine, thoracic spine, brain, and pelvis.  (R. 256-60, 313).  The MRI of the pelvis showed degenerative changes of the pubic symphysis with no evidence of sports hernia.  (R. 313).  The MRI of the brain showed non-enhancing stable white matter signal changes.  (R. 256).  The cervical spine MRI revealed moderate multilevel DDD with no disc herniation and moderate foraminal stenosis, while the thoracic spine MRI indicated mild multilevel DDD with no disc herniation.  (R. 257-60).

In a document dated January 14, 2020, Dr. Getzoff indicated that Plaintiff had significant pelvic area and perineal area pain, a history of fibromyalgia, and was seeing a specialist concerning possible pelvic congestion.  (R. 431).  According to the rheumatologist, the chronic pain interfered with her duties at work and activities of daily living ("ADLs"), especially sitting, standing, driving, and sleeping.  (*Id.*).  At her initial physical therapy evaluation conducted on January 23, 2020, Plaintiff reported that her pelvic pain had worsened over the past three years.

(R. 317).  Her pain was worse when walking and sitting.  (R. 317).  Dr. Getzoff referred Plaintiff

for an outpatient physical therapy evaluation for neck and shoulder pain.  (R. 432-36).  Plaintiff

reported that the pain was not new and that she just needed to try exercises and learn to manage

it.  (R. 432).

Plaintiff had a telemedicine appointment with Dr. Ahmed on April 2, 2020.  (R. 459-60,

501-02).  She continued to complain about pelvic pain but did say that Lyrica helped her sleep at

night.  (R. 459, 501).  Dr. Ahmed prescribed ketamine/lidocaine transdermal cream for sacral

pain.  (460, 502).

Plaintiff had four subsequent video appointments with Dr. Getzoff in 2020.  (R. 437-39,

443-45, 542-43, 550-52).  Plaintiff reported chronic pain interfering causing her trouble sleeping

and sitting, but the physical examination findings were generally unremarkable.  (R. 437-38,

443-44, 543, 550, 551-52).  Dr. Getzoff increased her dosage for Lyrica, and, by the end of the

year, ordered x-rays.  (R. 443, 551-52).  On September 8, 2020, Dr. Ahmed administered several

nerve block injections and a trigger point injection.  (R. 505-06).  Additional injections were

administered on September 22, 2020.  (R. 508-09).  Dr. Getzoff indicated that the injections had

apparently resulted in some improvement or relief.  (R. 542, 550).  On January 1, 2021, Plaintiff

told her primary care physician (Christine Zador Silverman, D.O.) that she had worsening

musculoskeletal pain in her left knee, which was interfering with her sleep, numbness in the legs

and feet, and pain in the lower back and sacrum.  (R. 516).  She cannot sit, and the medications

did not help with her ADLs.  (*Id.*).  Dr. Silverman noted she had pelvic shots, but Plaintiff

reported that it felt like the pain was returning.  (*Id.*).  Her physical examination findings were

unremarkable except for findings of mild distress from chronic pain, knee pain, and some sacral

and hip pain.  (*Id.*).  Dr. Silverman recommended gentle stretching and exercises for the left

lower extremity.  (R. 517).

X-rays taken on January 13, 2021 of the lumbar spine, pelvis, sacrum, and sacroiliac joints were all normal except for a finding of mild atherosclerotic changes of the abdominal aorta. (R. 556-58). An ultrasound of Plaintiff's left leg was also unremarkable. (R. 559). On February 4, 2021, Plaintiff was examined by Dr. Getzoff. (R. 560). She reported that she still had a great deal of pelvic and perineal pain together with generalized aching, which was keeping her up most of the night. (*Id.*). The physical examination findings were generally normal. (R. 561). Noting that it was too expensive for her to continue to receive treatment in New York City, Dr. Getzoff indicated that he would arrange for a local pain management doctor to see her. (R. 560).

Dr. Patrick Fall, D.O., a pain management physician, examined Plaintiff on February 9, 2021. (R. 527-29). Plaintiff presented with complaints of low back pain radiating to the buttocks and groin. (R. 527). She reported that she received two rounds of pelvic injections from her physician in New York City, which had resulted in some benefit. (*Id.*). She also said that she had benefited from physical therapy. (*Id.*). Upon physical examination, findings were made of limited range of motion of the back, tenderness to palpation of the lumbar spine, and a positive sacroiliac joint compression. (R 528). Dr. Fall assessed lower back pain, sacroiliitis, pelvic and perineal pain, lumbar radiculopathy, and fibromyalgia. (*Id.*). He recommended joint injections for persistent lower back pain. (*Id.*). In March 2021, Plaintiff began a course of physical therapy for her back pain. (R. 530-36).

Dr. Getzoff completed a "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)" form ("MSS") on March 28, 2021, providing his assessment of the limitations caused by Plaintiff's chronic pain, fibromyalgia, DDD of the cervical spine, and pelvic floor dysfunction. (R. 570-74). He indicated that Plaintiff could lift and carry no more than ten pounds on an occasional or frequent basis, could stand and walk less than two hours, and could

sit for about two hours during an eight-hour day.  (R. 570).  She also purportedly could sit and stand for ten minutes before changing position and would have to walk around for ten minutes in ten-minute intervals.  (R. 571).  The rheumatologist opined that she would need the opportunity to shift at will from sitting or standing/walking and that she would also need to lie down at unpredictable intervals during the work shift approximately two to three times per day.  (*Id.*).  He noted that Plaintiff could never twist, stoop or bend, crouch, climb stairs, or climb ladders and should also avoid even moderate exposure to extreme cold, extreme heat, wetness, humidity, pulmonary irritants, and hazards such as machinery.  (R. 571-72).  According to Dr. Getzoff, her ability to reach, handle, finger, feel, and push/pull was also impaired, and she would be absent from work because of her impairments more than three times a month.  (R. 572-73).  Dr. Getzoff indicated that Plaintiff's conditions or medications cause significant fatigue or drowsiness and that her conditions are likely to cause pain, which would significantly interfere with her ability to perform gainful employment.  (R. 574).  He concluded that Plaintiff cannot perform any gainful employment on a continuous and sustained basis.  (R. 574).

On March 17, 2021, Plaintiff had a video appointment with Dr. Getzoff.  (R. 563-65).  Her physical examination again showed normal findings, and Dr. Getzoff renewed her prescription for Lyrica.  (R. 563-64)

### B.    Non-Medical Evidence

Plaintiff testified at the administrative hearing that she stopped working on January 13, 2020 because of excruciating pain in her pelvis.  (R. 37).  The pain began in 2016 and worsened over time.  (*Id.*).  She saw a doctor in December 2019 because the pain was so severe that it prevented her from walking.  (*Id.*).  Plaintiff explained that she has fibromyalgia, which causes her a great deal of chronic pain from "head to toe" interfering with her ability to sleep, to get up, to sit, and to stand.  (*Id.*).  She said that "[t]here's pain at nighttime where I'm actually crying."

6

(*Id.*).  Plaintiff also has DDD, which she said she has had for a long time but has been getting progressively worse and causes pain in her back, neck, and chest.  (R. 37-39).  She also testified that she has sacral dysfunction, anxiety, IBS, fatigue, and pelvic floor syndrome.  (R. 37).  She admitted that she received injections for her pelvic floor issues, which had resulted in some relief.  (*Id.*).  But the problem returned, and she is currently undergoing physical therapy.  (*Id.*)  The physical therapy has not provided her with any noticeable relief.  (R. 47-48).  She also does home exercises when the pain does not prevent it, and Plaintiff acknowledges that the exercises temporarily help with her back and neck.  (R. 40).  Plaintiff added that she takes medications including Lyrica.  (R. 42).  Plaintiff explained that she could stand or sit for between ten to fifteen minutes and could walk for about five minutes.  (R. 40-42).  "If I pick up a gallon of milk, that, that's heavy for me because I feel it on my pelvi[s] and my sacrum."  (R. 42).

Plaintiff testified that she lives with her husband and drives locally, usually to go to medical appointments.  (R. 42).  She denied going on any vacations after the onset date but did indicate that she may have traveled to Rochester, New York, in 2019.  (R. 43-44).  Plaintiff also acknowledged that she went on vacation in Panama in January 2020 after getting married.  (R. 44-45).  She explained that she got up from her seat a couple of times during the flight to stretch because of the pain.  (R. 50-51).  According to Plaintiff, she traveled to New York City on three occasions to see a specialist, once by train and the other two times by car driven by her husband. (R. 49-50).  She acknowledged not stopping or taking any break even though she was in pain. (R. 50).  Plaintiff testified that she washes the laundry that her husband brings to her and does some of the cooking, although they have hired someone to clean the house once a week.  (R. 45). She also goes grocery shopping by herself for small items and with her husband for large items. and does not need assistance showering or dressing.  (R. 45-46).  She reads, has no other hobbies, and naps during the day.  (R. 46).

Plaintiff testified about her work history and the circumstances surrounding her decision to leave her position in January 2020.  (R. 52-55).  She spoke with her supervisor about her illnesses, limitations with sitting, standing, and lifting objects, and need to miss work.  (R. 52).  The supervisor was satisfied with the situation and indicated that Plaintiff's co-workers would pick up objects that she needed.  (R. 52, 54).  However, the employer did not provide Plaintiff with any specific accommodations, and her responsibilities remained the same.  (R. 53-54).  Plaintiff acknowledged that there was no change in her job performance and that she continued to receive excellent performance reviews.  (*Id.*).  She left her position voluntarily because of worsening pelvic pain.  (R. 54-55).

## III.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits [her] physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform [her] past work.  If the claimant cannot perform [her] past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *See, e.g.*, *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *See, e.g.*, *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The Court exercises plenary review over legal issues.  *See, e.g.*, *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## IV.    ALJ'S DECISION

The ALJ issued a decision in which she made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2.  The claimant has not engaged in substantial gainful activity since January 14, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: fibromyalgia, pelvic floor

syndrome, sacroiliitis, and degenerative disc disease (DDD) of the cervical spine (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).

6. The claimant is capable of performing past relevant work as a meeting planner or manager of industrial operations.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 14, 2020, through the date of this decision (20 CFR 404.1520(f)).

(R. 17-25).  Accordingly, the ALJ found that Plaintiff was not disabled.  (R. 26).


## V.    DISCUSSION

Plaintiff presents two claims in her request for review: (1) the ALJ's RFC determination lacks substantial evidence and is the product of legal error because the ALJ failed to properly weigh the opinion evidence proffered by Dr. Getzoff; and (2) the ALJ's evaluation of Plaintiff's subjective complaints ignored the "unique" nature of fibromyalgia.  (Pl.'s Br, ECF No. 7, at 1, 3-12).

### A.    Dr. Getzoff's Opinion

The ALJ found Dr. Getzoff's opinion unpersuasive because it was not well supported and was inconsistent with both the medical evidence and Plaintiff's own testimony and activities.  (R. 24).  Plaintiff contends that the ALJ thereby ignored her treating rheumatologist's opinion.  (Pl.'s Br., ECF No. 7, at 4).  According to Plaintiff, the ALJ failed to provide any explanation or cite any evidence to support her finding that the opinion was inconsistent with Dr. Getzoff's

examination findings and the overall record.  (*Id.* at 5-7).  The ALJ also purportedly did not consider and reconcile the evidence supporting and consistent with Dr. Getzoff's opinion.  (*Id.* at 6-7).  The Acting Commissioner responds that the ALJ thoroughly reviewed the evidence, properly applied the applicable regulations to assess Dr. Getzoff's opinion, and adequately explained why she found that medical opinion unpersuasive.  (Def.'s Br., ECF No. 10, at 4-9).  In her reply brief, Plaintiff argues that the Acting Commissioner presents nothing more than a post hoc rationalization for the ALJ's determination that cannot be considered by this Court.  (Pl.'s Reply Br., ECF No, 11, at 2-3).

I conclude that the ALJ adequately considered all pertinent medical and non-medical evidence in her evaluation of Dr. Getzoff's opinion and sufficiently explained why she found his opinion unpersuasive, thereby enabling this Court to conduct a meaningful review of her decision.

RFC is "the most a [Plaintiff] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  In order to determine the RFC, the ALJ is instructed to base the assessment on "all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3); *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001).  That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others.  *Id.*  Moreover, the ALJ's finding of residual functional capacity must "be accompanied by a clear and satisfactory explication of the basis on which it rests."  *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir. 1981).

The "ALJ must consider all the evidence and give some reason for discounting the evidence [she] rejects."  *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  An ALJ is free to reject a medical source opinion but in so doing must indicate why evidence was rejected so that a reviewing court can determine whether "significant probative evidence was not credited or

simply ignored." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *Cotter*, 642 F.2d at 705.  While an ALJ's decision need not discuss "every tidbit of evidence included in the record," *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004), it must still consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections," *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000); *see also Fargnoli*, 247 F.3d at 42 ("Although we do not expect the [administrative law judge] to make reference to every relevant treatment note in a case where the claimant ... has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with [her] responsibilities under the regulations and case law.").  Accordingly, "[t]he ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for [her] conclusion sufficient to enable meaningful judicial review."  *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (quoting *Burnett*, 220 F.3d at 120).

The Commissioner modified the Social Security regulations in 2017, changing the way ALJs evaluate medical evidence.  The prior regulations, which govern claims filed before March 27, 2017, divided medical sources into three categories:  treating, examining, and non-examining. *See* 20 C.F.R. § 404.1527.  ALJs were to weigh each medical opinion and could sometimes afford controlling weight to opinions from treating sources.  *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion.  *See* 20 C.F.R. § 404.1520c(a).  Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding.  *See id.*  Five factors determine persuasiveness:  (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing

12

a medical source has familiarity with the other evidence in the claim or an understanding of our

disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

ALJs must "explain how [they] considered the supportability and consistency factors" but need

not explain their determinations regarding the other factors.  *Id.*

      Regarding supportability, "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical

opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions

or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  Regarding

consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical

finding(s) is with the evidence from other medical sources and nonmedical sources in the claim,

the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."

20 C.F.R. § 404.1520c(c)(2).

      The ALJ provided an adequate "'discussion of the evidence' and an 'explanation of

reasoning' for [her] conclusion sufficient to enable meaningful judicial review."  *Diaz*, 577 F.3d

at 504 (quoting *Burnett*, 220 F.3d at 120).  Plaintiff posits that the ALJ failed to include any

explanation or citations in support of her findings.  (Pl.'s Br., ECF No. 7, at 5-7).  In fact, the ALJ

explicitly stated that Dr. Getzoff's opinion was not consistent with the claimant's testimony and

actions because Plaintiff "has not alleged any limitations in postural activities or manipulative

functioning, nor has she alleged increased symptomology with environmental factors such as

temperatures, wetness or pulmonary irritants."  (R. 24).  Plaintiff quotes the ALJ's specific

finding regarding postural activities or manipulative functioning, and she does not dispute the

ALJ's finding as to environmental factors.  (Pl.'s Br., ECF No. 4, at 4) (quoting R. 24).  Plaintiff

further admits that the ALJ rejected Dr. Getzoff's assessment that she would miss more than four

days of work a month on the grounds that there was no indication of any increased absenteeism

before her alleged onset date.  (*Id.*) (quoting R. 24).  Plaintiff asserts that the ALJ actually "relies

on" the fact that "because Plaintiff did not miss work before leaving her job that her functional

abilities were not impaired."  (*Id.*) (citing R. 24).

The ALJ does not have to "use particular language or adhere to a particular format in

conducting [her] analysis."  *Jones v. Burnett*, 364 F.3d 501, 505 (3d Cir. 2004).  Instead, her

decision must be "[r]ead as a whole" to determine whether "there is sufficient development of

findings to permit meaningful review."  *Id.* (quoting *Burnett*, 220 F.3d at 119-20).  The ALJ

concluded that the medical opinion was neither well supported by, nor consistent with, the

medical evidence, "as summarized above."  (R. 24).  As part of her overall assessment of

Plaintiff's RFC, she considered the medical and non-medical evidence in the record.  (R. 19-24).

She then found that the medical record did support some exertional limitations, specifically

limitations on lifting, walking, standing, and sitting.  (R. 20-23).  But the ALJ explained that the

limitations would not be work preclusive in nature and that the record did not support the alleged

level of decreased functionality.  (*Id.*).  Far from offering an improper "post-hoc rationalization"

for the ALJ's decision, *see, e.g.*, *Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012), the

Acting Commissioner properly relies on the ALJ's broader discussion of the evidence to show

that the ALJ appropriately considered the medical opinion and adequately explained why she

found the opinion unpersuasive under the "supportability" and "consistency" factors.  (Def.'s Br.,

ECF No. 10, at 4-9).  The ALJ's decision, read as a whole, allows this Court to conduct a

meaningful review of her determination to discount the medical opinion proffered by Dr.

Getzoff, *see, e.g.*, *Jones*, 364 F.3d at 505; *Favazza v. Kijakazi*, No. 21-17-CJB, 2023 WL 3055580,

at *13 n.13 (D. Del. Apr. 24, 2023) ("In other words, even though when the ALJ listed her

conclusion about the David/Lowe opinion, she did not then list the facts supporting that decision

14

immediately thereafter, it is obvious that the ALJ's conclusion was drawn in significant part from her analysis of the previously-summarized Mid-Atlantic records.") (citation omitted).

According to the ALJ, the medical opinion was unpersuasive because it was unsupported by Dr. Getzoff's own examination findings regarding Plaintiff's exertional functioning and inconsistent with the medical evidence of record as a whole.[1]  (R. 24).  In her RFC assessment, the ALJ explained that the diagnostic tests, which were mostly normal, and the typically unremarkable physical examination findings did not justify Plaintiff's allegations of significant impairments.  (R. 21-23, 251, 253, 256-60, 313, 408, 417, 426, 429, 444, 462, 499, 543, 556-58, 561).  The ALJ also stated that there was, in general, no evidence of any acute findings or other changes in Plaintiff's medical status immediately before her alleged disability onset date and that the record instead showed that Plaintiff merely continued to receive treatment for several ongoing chronic conditions at that time.  (R. 23).  This treatment, consisting of prescriptions for Lyrica and Zanaflex, two sets of pelvic injections, and physical therapy for her back and pelvic area, was relatively routine and conservative.  (R. 21-23, 407-08, 438, 443, 463, 499-50, 505-09, 527, 530-36, 550).  The ALJ also cited to evidence showing that some limited improvement or relief was reported because of her treatment.  (R. 21-23, 527, 550).

Plaintiff contends that the ALJ failed to consider and reconcile the evidence in the medical records that supported and was consistent with Dr. Getzoff's opinion (Pl.'s Br., ECF No. 7, at 7).  However, the ALJ explicitly rejected Dr. Getzoff's medical opinion concerning

---

[1]  Although the ALJ stated that Dr, Getzoff's opinion was inconsistent with his treatment records and examination findings, this determination implicated the supportability prong, *see e.g.*, § 404.1520c(c)(1) (stating that medical opinion will be "more persuasive" the "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion").  (*See* Pl.'s Br., ECF No. 7, at 6 (noting that ALJ's finding that Dr. Getzoff's opinion was inconsistent with his own examination records would be properly analyzed under supportability factor); Def.'s Br., ECF No. 10, at 6-7 (considering Dr. Getzoff's treatment records under supportability prong)).

Plaintiff's exertional limitations because it relied on the subjective complaints reported by the Plaintiff.  (R. 24).  More generally, the ALJ considered as part of her RFC assessment the complaints of chronic pain and other persistent symptomology that Plaintiff presented to Dr. Getzoff and the other individuals providing her with medical treatment.  (R. 21-24).  The ALJ accordingly noted that, in 2019, Plaintiff complained about continued problems of ambulation related to perineal pain.  (R. 21, 23, 416-17).  According to the ALJ, at subsequent rheumatological examinations after the alleged disability onset date, Plaintiff presented with complaints of restless leg syndrome, irritable bowel syndrome symptoms, worsening pain in the lower back, perinea, and pelvis, difficulty sleeping and sitting, and periodic numbness.  (R. 21-23, 442-43, 550, 560).  It was acknowledged that Plaintiff reported similar issues to the primary care physician, pelvic rehabilitation specialist, physical therapist, and pain management specialist.  (R. 21-23, 317, 459, 461-63, 499, 501, 516, 526).  The ALJ likewise acknowledged that there were some positive findings in the diagnostic testing and physical examinations.  (R. 21-23, 256-60, 313, 462, 499, 528).  In the end, the ALJ weighed the medical evidence that supported and was consistent with the treating rheumatologist's opinion against the opposing evidence, including the subjective nature of her complaints, the generally normal diagnostic and examination findings, the conservative and routine care she received, and evidence that the treatment resulted in some improvement or benefit for the Plaintiff (R. 21-24), *see, e.g.*, 20 C.F.R. §§ 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."), 404.1520c(c)(2) (stating that "more consistent" medical opinion is with evidence from other medical sources, the more persuasive it will be); *Plummer*, 186 F.3d at 429 (The "ALJ must consider all the evidence and give some reason for

discounting the evidence [she] rejects.").

Additionally, the ALJ considered and weighed the non-medical evidence in the record, 20 CF.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from other . . . nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be.").  Plaintiff acknowledges that the ALJ found that Dr. Getzoff's opinion "is not consistent . . . with the claimant's testimony and actions relative to her level of functionality, particularly as to exertional functioning."  (Pl.'s Br., ECF No. 4, at 4) (quoting R. 24).  In her RFC assessment, the ALJ summarized Plaintiff's testimony that she stopped working due to excruciating pelvic pain.  (R. 20, 37).  The ALJ also acknowledged that, according to her testimony, Plaintiff cannot sit or stand for long, has difficulty lifting a gallon of milk, needs help with the laundry and house cleaning, and cannot sleep through the night.  (R. 20, 37, 40-42, 45, 51).  However, these limitations were weighed against the fact that Plaintiff is able to take care of herself, perform routine household chores with some assistance from her spouse, read, go grocery shopping by herself for small items, and drive locally.  (R. 20, 23, 42, 45-46, 52-55).  The ALJ also emphasized that the Plaintiff continued to work full-time until the alleged onset date, with apparently no increased absenteeism, no requests for reductions in hours or any specific accommodations, little loss in productivity, and continued good job performance.[2]  (R.

---

[2]  Plaintiff contends that the ALJ mischaracterized the evidence in the record by finding that her functional abilities were not impaired because she did not miss work before the alleged January 2020 onset date.  (Pl.'s Br. at 4-5).  She did testify that her supervisor asked her about her illnesses and that she responded that she had limitations sitting, standing, and lifting things and would need to miss work.  (R. 52).  According to Plaintiff, the supervisor was satisfied with this arrangement and indicated that her co-workers would pick up objects that she needed.  (R. 52, 54).  However, Plaintiff also indicated that her employer did not provide her with any accommodations and her responsibilities remained the same.  (R. 54).  She admitted that there was no noticeable change in either her job or her work performance.  (*Id.*).  Given the testimony, the ALJ reasonably found that her job did not really change before she left and that, instead, her supervisor was simply aware that there were certain things she could not do.  (R. 20-21).  There is substantial evidence to support the ALJ's finding that there was no increased absenteeism due to her impairments prior to her alleged onset date.  (R. 24).

20, 23-24, 52-55).   As the ALJ explained, Plaintiff left her job voluntarily, and, although the ALJ

misstated the timing (claiming it occurred after she had quit her job), she also left the country for

ten days immediately before her voluntary resignation.  (R. 20, 23, 44-45, 50-51).  The ALJ

similarly found that Plaintiff was able to travel on three occasions (once by train and twice by

car) to New York City for appointments with her pelvic specialist.[3]  (R. 23, 49-50).

     Because the ALJ adequately considered all pertinent evidence and adequately explained

why she found that his opinion was neither supported by nor consistent with the evidence to

---

     Plaintiff also states that "the ALJ is considering time before the Plaintiff's alleged onset date, at a point in time when she *was* capable of work, not during her period of alleged disability." (Pl.'s Br., ECF No. 7, at 5).  But this is not a case where Plaintiff alleges disability based on an injury that occurred on a particular date.  *See, e.g.*, *Cassler v. Colvin*, No. 12-cv-05015, 2014 WL 4249776, at *2 n.5 (E.D. Pa. Aug. 28, 2014) (noting that claimant alleged life-long mental impairments).  Instead, she testified that her pelvic pain started in 2016 and had worsened by 2020, and her medical records showed that she began to receive treatment for fibromyalgia as early as 2019.  (R. 20-21, 37, 407-10, 416-18, 425-30).

   [3]  In arguing that the ALJ failed to properly weigh the opinion evidence, Plaintiff asserts that, because the ALJ made a conclusory finding in her RFC assessment, this Court cannot assess whether the ALJ complied with Social Security Ruling 96-8p.  (Pl.'s Br., ECF No. 7, at 7).  Social Security Ruling 96-8p provides in relevant part that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  SSR 96-8p, 1996 WL 374184, at *1.  However, the Third Circuit has stated that "[t]his language does not command ALJs to make specific, written findings on dozens of individual work function categories."  *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00-1995, slip op. at 4 (3d Cir. Dec. 19, 2000).  The court explained that "[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing."  *Id.*  Rather, our Court of Appeals reasoned that the "Narrative Discussion Requirements" in the Ruling "describes more fully what an ALJ must articulate regarding a claimant's RFC"; specifically, that "[i]n his or her written opinion, the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record."  *Id.* at 4-5 (citing SSR 96-8p, 1996 WL 374184, at *7); *see, e.g.*, *Chairadio v. Comm'r of Soc. Sec.*, 425 F. App'x 158, 161 (3d Cir. 2011) (affirming RFC determination despite fact that ALJ "did not make a task by task or function by function" analysis because supported by substantial evidence).  Given her thorough discussion of the record, I am satisfied that the ALJ adequately reviewed both the medical and non-medical evidence together with the opinion evidence and provided a clear explanation for the determination that Plaintiff retained the RFC to perform the full range of light work.  (R. 19- 24).

allow this Court to conduct a meaningful review of her decision, the Court will not remand this matter on the basis that the ALJ did not properly evaluate the opinion evidence.

**B.      ALJ's Assessment of Plaintiff's Subjective Complaints and Credibility**

As part of an RFC analysis, the ALJ must determine the credibility of a claimant's subjective complaints by evaluating the intensity and persistence of the symptoms to determine the extent to which those symptoms limit the individual's ability to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  Social Security Ruling 16-3p establishes a two-step process in evaluating the plaintiff's subjective symptoms: (1) determine if there is an underlying medically determinable physical or mental impairment, shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the plaintiff's pain or symptoms; then (2) evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the plaintiff's functioning.  SSR 16-3p, 2016 WL 1119029, at *4-8 (Oct. 25, 2017).  In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must consider relevant factors such as the objective medical evidence, evidence from medical sources, treatment course and effectiveness, daily activities, and consistency of the plaintiff's statements with the other evidence of record.  *Id.*

An ALJ is required to "give serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence."  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).  If the complaints "are not fully credible," the ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints."  *Weber v. Massanari*, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001).  However, "a[n] ALJ must give great weight to a claimant's subjective testimony . . . when this testimony is supported by competent medical evidence."  *Schaudeck*, 181 F.3d at 433.

19

As discussed in Section V.A., *supra*, the ALJ acknowledged Plaintiff's testimony that she stopped working in January 2020 due to pain in the pelvic area and her claim that she cannot work because of fibromyalgia, pelvic floor syndrome, and DDD.  (R. 20, 37, 194-209).  The ALJ further stated that, according to Plaintiff, she can stand or sit for ten to fifteen minutes; she can walk for possibly five minutes; she finds lifting a gallon of milk difficult; her husband carries the laundry; they have someone else clean the house; she has no hobbies; and she takes naps during the day if she has not slept well and often cannot sleep through the night due to the pain.  (R. 20, 37, 40-42, 45, 51).  Applying the two-step analysis, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning their intensity, persistence, and limiting effects were not entirely consistent with the medical and other evidence in the record "for the reasons explained in this decision."  (R. 21).  The ALJ's "reasons" included the generally normal diagnostic and physical examination findings; her relatively routine and conservative treatment, which resulted in some improvement or relief; her employment and travel history and the lack of any evidence of a change in her medical condition prior to the alleged onset date; and the evidence indicating that she is able to engage in several ADLs.  (R. 22-23).  Giving the claimant some benefit of the doubt as to her subjective claims of worsening symptomology, the ALJ found that the the medical record would support some limitations in exertional functioning but would not support the alleged level of decreased functionality and would not be work preclusive in nature.  (R. 23).

Plaintiff argues that the ALJ's evaluation of her subjective complaints overlooked the unique nature of her fibromyalgia impairment.  (Pl.'s Br., ECF No. 7, at 9-12).  She contends that the ALJ heavily relied on the lack of objective evidence to support her subjective complaints of pain even though the lack of such evidence is not a legitimate basis to reach an adverse credibility determination in a fibromyalgia case given the nature of the condition, which largely

evades objective review.  (*Id.* at 10-11) (quoting *Henderson v. Astrue*, 887 F. Supp. 2d 617, 638 (W.D. Pa. 2012); *Smith v. Comm'r of Soc. Sec.*, No. 09-182, 2009 WL 276287, at *4 (W.D. Pa. Aug. 31, 2009); *Foley v. Barnhart*, 432 F. Supp. 2d 465, 480 (M.D. Pa. 2005)).  Furthermore, she challenges the ALJ's use of her normal range of motion, strength, reflexes, and gait on the basis that such findings are irrelevant to her condition.  (*Id.*) (quoting *Henderson*, 887 F. Supp. 2d at 638).  The Acting Commissioner responds by arguing that the ALJ appropriately considered Plaintiff's subjective complaints based on the evidence of her work and travel history, ADLs, and course of treatment.  (Def.'s Br., ECF No. 10, at 10-13)  She also contends that the ALJ appropriately considered the objective clinical evidence as one of several factors in assessing the Plaintiff's subjective complaints.  (*Id.* at 11 n.4).

It is undisputed that, "[i]n evaluating fibromyalgia, courts acknowledge that symptoms of the disease are entirely subjective and medical testing may not be able to assess its severity," *Osborne v. Berryhill*, No. 16-96, 2017 WL 818846, at *3 (W.D. Pa. Mar. 2, 2017).  However, "a claimant who has been diagnosed with fibromyalgia will not automatically be classified disabled under the Social Security Act."  *Id.* (citations omitted).  "Even in fibromyalgia cases, the ALJ must compare the objective evidence and the subjective complaints and is permitted to reject plaintiff's subjective testimony so long as he provides a sufficient explanation for doing so."  *Id.* (quoting *Nocks v. Astrue*, 626 F. Supp. 2d 431, 446 (D. Del. 2009)).  In this case, the ALJ properly weighed both the objective evidence and the Plaintiff's subjective complaints, and substantial evidence supports her determination that Plaintiff's subjective statements were not entirely consistent with the record evidence.

Substantial evidence exists to support the ALJ's findings that Plaintiff's diagnostic testing and physical examinations were not consistent with Plaintiff's alleged level of impairment and that there were no acute findings made in connection with her alleged January

2020 disability date (R. 23).  *See, e.g.*, *id.* at *4-*5 (finding that ALJ properly evaluated

plaintiff's credibility and fibromyalgia by relying, among other considerations, on her

"essentially normal" physical examination findings and "essentially unremarkable" diagnostic

imaging studies).  The 2019 MRIs of the Plaintiff's cervical and thoracic spine, pelvis, and brain,

and a 2021 x-ray of her pelvis, were mostly normal.  (R. 21-23, 256-60, 313, 556-58).  Similarly,

the physical examination findings were generally unremarkable.  (R. 21-23, 251, 253, 408, 417,

426, 429, 444, 462, 499, 543, 561).  In fact, Plaintiff states in her brief that her "studies" were

"normal," with "relatively minor abnormalities on exam," and that she had "normal ranges of

motion, strength, reflexes, and gait."  (Pl.'s Br., ECF No. 7, at 10) (citing R. 21-23).

Plaintiff claims that the "the vast majority" of the ALJ's criticisms relate to the normal

examination findings and relatively minor abnormalities and that the ALJ's evaluation was

affected by her vain search for objective findings and her overarching failure to consider the

nature of fibromyalgia.  (*Id.* at 10-11).  However, the ALJ clearly considered more than the

results of diagnostic testing and physical examinations in her assessment of Plaintiff's

credibility.  She instead addressed the course of treatment and its effectiveness, Plaintiff's own

testimony regarding her daily activities, and her work performance and history of travel, *see,

e.g.*, SSR 16-3p, 119029, at *5-*8.  The ALJ reasonably cited to evidence of the relatively

routine and conservative care Plaintiff received, which consisted of prescription medications,

physical therapy, and injections and which resulted in some relief for Plaintiff (R. 20-23, 505-09,

527, 542).  *See, e.g., Brown v. Comm'r of Soc. Sec.*, 680 F. App'x 822, 826 (11th Cir. 2017) (per

curiam) ("Indeed, with the exception of surgery for her carpal tunnel syndrome, her doctors

primarily recommended conservative treatments—like prescription medications, physical

therapy, and diet and exercise.  What's more, her treatments in 2013—including epidural shots,

medications, ice, heat, and immobilization—appeared to provide her with relief, and her doctors

adjusted her prescriptions during that time to address their side effects.").  In addition, the ALJ properly explained that, although Plaintiff has some limitations in her everyday activities, she is able to engage in self-care, help with routine household chores and shopping, and drive.  (R. 20, 23, 42, 45-46).  Even though she had already been diagnosed with, and had started to receive treatment for, fibromyalgia and her other conditions before her alleged onset date, Plaintiff continued to work full time until January 2020, and there is substantial evidence in the record to support the ALJ's finding that she remained at her job with little to no loss in productivity, strong job performance, and no specific accommodations or excessive absenteeism.  (R. 20, 23, 52-55).  In fact, she traveled to New York City for treatment in 2019 and 2020, and, immediately prior to her alleged onset date, she went on a ten-day honeymoon in Panama.  (R. 20, 23, 44-45, 49-51).  Thus, the ALJ was justified in determining that Plaintiff was not disabled, notwithstanding her subjective reports and testimony regarding the severity of her symptoms.  *See, e.g.*, *Eich v. Berryhill*, No. 17-5815, 2018 WL 6061580, at *8 (D.N.J. Nov. 20, 2018) (the claimant watched television, read, played video games, socialized with relatives, and used a computer, email, and Facebook); *Wiemer v. Astrue*, No. 02:08-cv-0412, 2009 WL 5633932, at *4 (W.D. Pa. Mar. 5, 2009) (the claimant watched television, read the newspaper, socialized with relatives and friends, occasionally dined at restaurants, surfed the internet, and performed household chores and repairs).

Because substantial evidence supports the ALJ's determination that Plaintiff's subjective statements regarding the severity of her conditions and impairments were not fully credible, the Court will not remand this matter on the basis that the ALJ did not properly evaluate the Plaintiff's subjective complaints.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's Request for Review is **DENIED**.  An

appropriate Order follows.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge